## Case No. 16,704.

UNITED STATES v. WILLIAMS.

[See Case No. 17,708.]

## Case No. 16,705.

UNITED STATES v. WILLIAMS.

[4 Am. Law J. (N. S.) 486.]

District Court, E. D. Pennsylvania. Feb., 1852.

### Fugitive Slave Law.

[1. The fugitive slave law (section 7) makes it a criminal offense knowingly and willfully to frustrate or retard the attempted recapture of a fugitive slave by his master, whether it be by force, active or passive, or stratagem.]

[2. The offense being a misdemeanor, one aiding or abetting another to commit it, whether he be absent or present, is guilty as a principal.]

[This was an indictment against Samuel Williams under the seventh section of the fugitive slave law.]

KANE, District Judge (charging jury). The case derives all its interest, and almost all its importance, from circumstances that can have no bearing upon its determination. It is immaterial what was the character or what were the consequences of the Christiana outrage, so far as this trial is concerned, provided it involved the crimes laid in the indictment. Equally immaterial is it, what may be the feelings, whether of sympathy with the prisoner or of indignation against him, that may obtain in this

community, or elsewhere,—or what may be the criticisms with which our judgment is hereafter to be visited. We have nothing to do with external opinion, present or prospective. There has been thrown upon my table, since this trial began, a somewhat censorious commentary on the action of our circuit court in the recent treason case.[1] It emanates professedly from the executive department of one of the states; though its tone and spirit, its misapprehensions of the adjudication it condemns, the inconsequence of its logic, and the want of comity if not of self-respect which it manifests, might assert for it a less dignified authorship. But whatever may be its pretensions to notice from others, I have no purpose to reply to it. I have learnt long since, that he, whose aim or whose hope it is, to satisfy that miscalled public sentiment, which flames so fiercely and briefly in the pyrotechnics of party controversy, must admit a versatility of principle, inappropriate to the functions of the bench. I have learnt, too, that there is a higher public sentiment, less variable and more enduring, that vindicates for official fidelity and honor their just recompense of fame; and I am convinced, that for a causeless assault upon judicial character or bearing, there is no rebuke so appropriate or so pungent as that which is administered by silence. I abstain carefully therefore from any defence of my colleague who presided in that cause. A man so pure, so learned, so indefatigable, so fearless, in all regards so eminent as he is, cannot need a defender any where. And, as to his rulings throughout the trial, and the views that were expressed in the charge, I am too well content to share in the responsibilities that may attach to them, to invite from me a single remark in support of their correctness. I should not have adverted to this distasteful circumstance at all, but as this cause grows out of the same transaction with the case of Hanway, and is watched with something of the same feeling, I am anxious to caution you, however needlessly, against yielding in the slightest degree to apprehensions of censure, or the more insidious influences of popular favor. We cannot look around the court-room, without seeing that this prosecution has enlisted conflicting opinions and wishes in our community. However we may decide. there will be some to approve our action,—more, probably, to condemn it. We have but one path to follow,—it is the easiest, and in the long run the safest,—that which is pointed out by a disciplined and fearless conscience.

The questions for you to try are two: (1) Was there on the occasion referred to, a criminal infraction of the seventh section of the fugitive slave law [9 Stat. 464]? (2) Was the defendant one of the guilty parties to that infraction? The descriptive words of the section are as follows: "That any person who shall knowingly and willingly obstruct, hinder, or prevent such claimant, his agent or attorney, or any person or persons lawfully assisting him, her, or them, from arresting such a fugitive from service or labor, either with or without process as aforesaid—or shall rescue or attempt to rescue such fugitive from service or labor, from the custody of such claimant, his or her agent or attorney, or other person lawfully assisting as aforesaid, when so arrested pursuant to the authority herein given and declared—or shall aid, abet, or assist such person so owing service or labor as aforesaid, directly or indirectly to escape from such claimant, his agent or attorney, or other person or persons legally authorized as aforesaid—or shall harbor or conceal such fugitive, so as to prevent the discovery and arrest of such person, after notice or knowledge of the fact that such person was a fugitive from labor or service as aforesaid;"—shall, &c., &c., &c. The power of congress to legislate upon this subject is derived from the second section of the fourth article of the constitution: "No person held to service or labor in one state under the laws thereof, escaping into another, shall in consequence of any law or regulation therein be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such labor or service may be due." As the provisions of the law must be understood of course with reference to the authority under which it was enacted; and as the constitution provides only for the case of fugitives escaping from one state into another, and there claimed: it is plain that the act of aiding a slave to escape from the domestic custody of his master, however reprehensible such an act may be, is not an offence within the meaning of the fugitive slave law. The action which it forbids is of a subsequent time, when the slave has passed beyond the limits of the state under whose laws he was held: and it must be such action as tends to make the master's claim of recaption ineffective, or to molest him in its exercise. Beyond this the act does not go.

Bearing this in mind, we may distribute the subjects of this section under four titles, two of which relate to offences that may be committed before the arrest, and two to offences that may be committed after it: (1) The harboring or concealing a fugitive, after knowledge or notice that he is such, so as to prevent his discovery and arrest; (2) the knowingly and willingly obstructing. hindering, or preventing the claimant or his representative from arresting the fugitive; (3) the rescuing or attempting to rescue a fugitive after arrest; and (4) the aiding, abetting or assisting him to escape from the claimant or his representative after recaption. I repeat it; for in

---

[1] See Judge Grier's opinion in U. S. v. Hanway [Case No. 15,299.]

other cases, though not perhaps in this, the remark may be important: the "escape," to which this part of the section refers, is an escape after recaption. As I have already shown, the constitutional provision, under which alone congress has power over the subject, has no application to the original escape from the master's homestead; and there can be no second escape until after recaption. Not that it is lawful to abet or assist the slave, after he has passed into our state, in frustrating or eluding the claimant's pursuit. But this is not the offence of assisting him to escape, though it may be included appropriately in that of obstructing, hindering, and preventing the arrest. There is then but one form of offence in question here; for there is no evidence of harboring, and none of attempted rescue or escape after arrest. The only part of the section which we have to consider, is that which speaks of obstructing, hindering or preventing an attempted arrest. "Obstruct, hinder, prevent;" these words as commonly used are synonyms, and are given as such in the dictionaries. But they are of different roots, and are employed conventionally to express varying shades of meaning. Speaking etymologically; to obstruct, "ob-struo" (Lat.), is to build or set up something in the way; to hinder, "hind" (Anglo-Saxon), as in "behind," "hindmost," is to pull back; to prevent, "prævenio," (Latin), is to come before, to thwart by anticipating. In a more critical acceptation, "obstruct" implies opposition without active force, and does not imply that the opposition was in the end effective; "hinder" implies action, and to some extent effectiveness; to "prevent" is to be effective, but not necessarily by force, either active or inert. Thus, it may be, that an officer of the law was obstructed in his duty, and hindered perhaps for a time, but not finally prevented from performing it. So too, he may have been obstructed; but surmounting or avoiding the obstruction, he may have been not even hindered. Again, he may be prevented by stratagem, though stratagem alone can neither hinder, or obstruct him; and yet, should the success of the stratagem involve action, as it would almost necessarily, it might be very questionable whether the act ought not to be regarded as a hindrance.

These distinctions are, however, the appropriate subjects of scholastic, rather than juridical disquisition. Statutes defining crimes, unless the phraseology they employ has been itself legally defined, must be interpreted as their language is understood by mankind at large,—according to the every day import of the words. I shall, therefore, charge you, that the words "obstruct," "hinder," and "prevent," in the act before us, mean substantially the same thing; and that it is accordingly criminal, knowingly and willfully to frustrate or retard the attempted recaption of a fugitive slave by his master or his representative, whether it be by force, active or passive, or by stratagem. And I further charge you, that, the offence being a misdemeanor, he who aids, abets, or assists another to commit it, whether he be present or absent at the consummation of the deed, is himself guilty as a principal. But the aiding, abetting, and assisting, must have reference both to the principal wrong-doer and to his crime. It is not every act, which contributes to or facilitates the perpetration of an offence, that is regarded in law as accessorial to it; even though the act be in itself immoral or unlawful. It must be something that is connected with the particular offence, and that supposes some degree of complicity in it with the principal offender. To convict one as accessory to a felony, or to involve him in the guilt of a misdemeanor for an act in which he participated indirectly, it must be shown that he was privy to its commission by others, or at least that there was a concert of purpose and of act between him and them in regard to it. So, in the case of Rex v. Bingley (before the twelve judges), Russ. & R. 448, while it was held not to be necessary that all should be present at the consummation of the crime, but that all might be guilty, though each had contributed his part towards it separately from the rest, yet the conviction was sustained on the ground that the act of each was "in pursuance of a common plan." And there is cardinal good sense in all this. For while, on the one hand, it would be a mockery of justice, if criminals could elude conviction, by ingeniously distributing the parts of their drama,—on the other hand, no man could be safe in rendering the commonest offices of friendship or charity, if he were held liable to share all the guilt which his kindness towards others might enable them to commit. An act innocent in purpose, and innocent in fact at the time, cannot be made unlawful by the acts of others.

I believe these few and simple propositions embody all the views which I need present to you of the law of this case. So far as they relate to the statute under which the defendant is indicted, you will perhaps agree with me that they do not justify the obloquy with which that statute has been assailed. It is not true, as I read its history and its provisions, that it strikes at the justly regulated sympathies of manhood; for the first sympathies of every man should be with his country, her safety, and her honor, and these exact as indispensable a ready and abiding fidelity to the constitutional compact. It does not violate the domestic charities; you may give rest to the weary, food to the hungry, clothing and a home to the necessitous—yes, and speed him on his way, whether he be bond or free; if your motives be honest, your purpose ingenuous, if you have not sought to wrong the master under cover of charity to the slave, this law does not condemn you. But you shall not, because you

disbelieve in the wisdom, or the safety, or the justice of the institutions, which the people of other states have made for their own government, and while your faith stands pledged to them that their institutions shall be respected, and while you are receiving the benefits which they plighted to you in return, you shall not justify the forfeiture of your pledge by appealing to your conscience. You shall not, under pretext of exercising charities or indulging sympathies, stand between your neighbor and his covenanted rights, make inroads upon his estate, or endanger his fireside. You shall not harbor and conceal a fugitive, whose arrest is authorized by the constitution under which you live; you shall not obstruct, or resist, or prevent the man, who with lawful authority seeks to arrest him; you shall not seek to rescue him when arrested; or make the arrest futile by ministering to his escape. Such, as I understand it, is the fugitive slave act, an act called for, as I have always thought, by the exigencies of the time, in accordance with the constitution, both in principle and terms, and to be construed by it; an act, which can be held up to popular censure, only by expanding its provisions beyond their object and import, and thus violating the fundamental rules of legal interpretation.

There are several questions of law that have been raised by the counsel for the defence, to which I have not thought it necessary now to advert, some of them grave ones. Should your verdict make them important, they can be discussed hereafter. If you believe the evidence, it is in proof that the crime of obstructing, hindering, and preventing the claimant of a fugitive from making the arrest of his fugitive has been committed within the meaning of the act of congress. It is on the other hand admitted, that this defendant was not, at the time when the offence was committed, personally present at the place of its commission. The question, to be answered by your verdict, is whether he so was connected with the perpetration of the crime as to share the guilt of the immediate actors? The answer to this question involves two inquiries, on both of which you must pass: (1) What connection in point of fact? and (2) what community of purpose, or in the words of the twelve judges, what "common plan" does the evidence establish between Williams and the men who assembled at Parker's house, to obstruct, hinder, or prevent the arrest or capture of Mr. Gorsuch's slaves? For, such a connection in fact, and such a community of purpose, must be established in proof, or your verdict must be one of acquittal.

The evidence that bears on these inquiries is in a small compass. It is before me, as reported with admirable accuracy by the phonographic reporters, and I will with much pleasure read over to you such parts as any of you may judge material. As I understand the facts supposed to be proved, they are, on the part of the prosecution, these: That the defendant went up in the cars on the night of the 9th of September (the outbreak near Christiana being on the morning of the 11th.) as far as Penningtonville, arriving there about 2 o'clock in the morning of the 10th, that he was recognized there by one of the officers who had been employed by Mr. Gorsuch; and that when this officer afterwards proceeded on in a wagon, he saw a person whose dress appeared in the dim light to resemble the defendant's, following the wagon for a time at a distance; that the defendant went after day-light on the morning of the 10th to the house of a witness, whom he did not know, some three miles from Parker's house, saying that he had mistaken it for the house of another man, whom he wished to inform that he had come up in the cars with several men who were after slaves, and he requested the witness to let the slaves know; that he said one of the slaves was named Nelson, and that the names of three others were on a paper that he had left at Christiana, but without saying with whom, or where the slaves were to be found; that he parted with the witness to go back to the railroad; and that he got into the cars about 9 o'clock in the morning, and returned to Philadelphia; and that when arrested for treason some five days afterwards, he said to the officer who arrested him, in the hearing of the witness, an assistant officer, that he had conveyed the news to Christiana, and would do so again if he was at liberty, and that he considered it his duty to do so.

On the part of the defence, the defendant's visit to Penningtonville, was explained by the fact that he went there to demand payment of a note which was due to him from a colored person living there; and it was argued that the bearing of the officer at Penningtonville, as well as his imputed character, was such as to justify the suspicion that he was on an illicit errand; that there having been anxieties and alarm for some weeks before among the colored population of the neighborhood, in consequence of attempts made to kidnap free persons near them, some of which had been successful, as was proved, and the defendant being himself a colored man, he would naturally, and might lawfully desire, that what he had seen and what he suspected should be known to the parties endangered; and the officer who arrested him, who had made a minute at the time of the defendant's language, swore that he spoke of kidnappers and kidnapping, and not of the reclamation of slaves. Besides this, the defendant has proved by several witnesses of standing among us, that he has for many years been known as a meritorious and law-abiding man.

If these are the facts, it will be for you to say, whether they establish any connection whatever between the defendant and the law-breakers at Parker's house; and whether, if so, they establish a complicity on his part in

any of the transactions that occurred there, any combination with the principal wrongdoers, any community of purpose and of plan. You are not to presume guilt; but if you have reasonable doubts, they are to make for the defendant. On the other hand you are not to require direct proof of that, which from its very character can only be reached by inference from attending circumstances. The question of fact is for you, not for the court to pass upon. I leave it with you, satisfied that you will render an honest and impartial verdict.

Verdict not guilty.